The next matter, number 24-1208 and number 24-1303, United States v. Mehdi Belhassan. These are cross appeals at this time. Can we hear from the appellant, Cross Appellee, for Belhassan? Good morning, Your Honor. May it please the Court, Megan Sittle on behalf of Mehdi Belhassan. May I reserve three minutes of my time for rebuttal? You may. Thank you. At bottom, this is a case about a business that was successful for many years and ultimately failed. It makes little sense to contend that Mr. Belhassan would have intentionally turned his successful business into a fraud. And it makes even less sense to argue that his employee, Harriet Wingrove, would have knowingly participated in any scheme to defraud. I'm going to start with the aggravating role enhancement issue, and then I'll turn to the government's cross appeal. It was clear error for the District Court to find that Harriet Wingrove was a participant in any scheme to defraud for two reasons. First, there was no evidence that Ms. Wingrove had any intent to defraud any of the parents. And second, there was no evidence that she had knowledge of much of the alleged scheme. Ms. Wingrove was essentially an employee of a failing business, not someone who was intending to defraud their customers. Most importantly, there's no evidence that Ms. Wingrove ever knew anything about the finances of MBSports. She's not on the bank account. There's no evidence that she had any knowledge whatsoever of any negotiations with ITREA. There's no evidence that she had any knowledge of discussions with ACTIV about potentially funding in advance. And there's no evidence that she had any idea how the money in Mr. Belhassan's bank account was being spent. She was simply in the dark, an employee doing what her boss asked her to do. And instead, the evidence affirmatively shows that Ms. Wingrove believed there would be a camp and she was actively working to make that happen. The District Court correctly found that Ms. Wingrove was not a participant at a minimum at the beginning of the 2019 camp season. And that finding makes sense. You see her in that time period repeatedly reaching out to potential host locations for the camp. And she was previously an employee of MBSports before the 2019 camp season. So she would have known that this was a business that had successfully run camps in the past. Counsel, can I ask you to move to some of the evidence about what happened in June and I think early July perhaps? Because, you know, I think one of the challenges is a jury could have viewed things the way that you're presenting them, but the evidence also could have been viewed differently. Because, for example, Ms. Wingrove sends an email dismissing all the camp counselors on May 31st, I think it is. And then in June, she's corresponding with parents about there's still going to be camp. And then there's the issue of the, I think it was French campers who are billed in early July when there's just no indication that there's going to be a camp starting in just days. And yet she participates in figuring out how much they should be billed and sort of supporting the billing of those parents. So I'm just not sure how we could say that there's no way that a reasonable jury could look at that and think that that was problematic. Sure. So the May 31st email where Ms. Wingrove dismisses some of the camp counselors specifically says that MBSports is going to be partnering with another camp that year. And there's also evidence in the record that Mr. Bellasson was reaching out to U.S. Sports, which was the camp that took over at Curry College, to try to host some of MBSports' campers. And so there's nothing suggesting that Ms. Wingrove didn't believe that those efforts would be successful. Those are all efforts that were being undertaken by Mr. Bellasson, and she wasn't involved in those discussions. But doesn't the evidence show that there was no actual arrangement for another camp at that point? And she had, you know, again, everything that she would have known, she dismissed the counselors, there was no existing arrangement pointed to no camp in a few weeks. And yet she's telling parents the opposite. And again, let's move four weeks later. We're now in early July, and she's billing people thousands of dollars when there's no camp arrangements in place. Yes, so the July invoices, I believe, were intended to be placement for those campers in another camp. But admittedly, there was no camp that had been arranged at that time period, and it did quickly fall apart at that stage. And wasn't the camp supposed to start just days later? Yes, yes, that's correct. So I'll turn to the government's cross appeal. The government asked this court to limit the district court's discretion. I'm sorry to do this to you. I'm not quite finished with the first part. This is for a sentencing enhancement? Yes. What's our standard of review for the findings? Clear error. And what's clear error based on? I'm sorry, I don't understand the question. With respect to the burden of proof below, we're doing clear error for a beyond a reasonable doubt finding, or clear error for a preponderance finding? What are we supposed to be doing? That's all I'm asking. I think given this court's precedent, you would be reviewing clear error under a preponderance standard. And we don't have a finding under a preponderance standard in this case, right? That's correct. The finding the district court made would have been under the reasonable doubt standard. Okay. Proceed with your second argument. The court should decline to curb the district court's discretion for four reasons. First, the Supreme Court recognized in Kimbrough that district courts are in a better position than the Sentencing Commission to address individual cases, and expressly affirmed a district court's ability to vary from the guidelines based on policy disagreements. What does that have to do with the obligation of the district court first to correctly calculate the guidelines? You can't just go in, totally ignore the guidelines structure, and say, gee, I don't agree with what Congress says about sentencing. I don't agree with what the Supreme Court says. I don't agree with what the First Circuit says. I'm going to throw out all of that, and I'm going to say Kimbrough authorizes that. Kimbrough plainly does not authorize that. So that's not a good starting point. Well, I'll just respond by saying I read the district court's practices here, as well as the sentencing transcript here, very differently than the government. I think the district court is following that process when it describes its overall process and its written opinions. At Step 3, it calculates the guidelines using the preponderance standard and considering all information submitted to it. And then it proceeds to consider the other 553A factors. I agree it's not very clear in this transcript that that's what happened here, but I think there are indications that it is what happened here. The district court starts out by saying he's talking about this constitutional maximum theory that he has, and then starts discussing the guidelines in that context, then says he's skipping ahead because the parties are jumping into guidelines arguments. Do I take it you agree that you are supposed to start with the guidelines calculation? I agree that that is the process laid out in Kimbrough, yes. Okay, next question. Do you agree that that is to be done on a preponderance of the evidence basis? So I agree that the district court... I mean, your argument is you think that's what the district court did, so you seem to agree that that is the correct standard. I do agree, and then I think the district court can vary based on policy disagreements with the reasonable doubt standard as well. Okay, and if we disagree with your reading of the transcript, you concede it's error? I would agree that doesn't follow Kimbrough. If it were error, I think it's harmless error. Okay, why is it harmless? Sure, so in a typical sentencing appeal, if the district court miscalculated the sentencing guidelines, it would have the wrong anchor in mind when it proceeded to do the 5353A on that analysis. And it's that anchor that's really driving the guidelines ability to smooth out unwanted sentencing disparities, because everyone's starting from the same point. Here, on this record, that anchor is there. I think both parties agree that there is an implicit finding, at least, at loss by a preponderance standard in the district court's restitution order. And both parties agree that the government's sentencing memo correctly sets out the guidelines calculation based on that loss figure. So that is in the record. It's discernible in the record. And I would direct the court to pages 874 and 75 of the joint appendix. This is where the district court talks about the restitution order, and it does so explicitly connecting that restitution order with its consideration of whether and how much time Mr. Bellassagne should serve in prison. So it says, again, I'm holding myself to prove beyond a reasonable doubt I come up under 550,000, but restitution is a different kettle of fish. And then later on the next page, the court says, I'm left with the duty of coming up with a fair and just sentence, and I don't see how it can be a long period of probation. So it's connecting the restitution loss figure with the analysis of how much time Mr. Bellassagne should serve. And so I think even though it's not as clear as it could have been in this record, it is discernible in this record that the district court is considering the preponderance standard. I'll also note that the government's concern that the district court's practices here impose too high a burden on it have not borne out in practice. For example, in this case, it would have been a very simple matter for the government to prove loss at trial. The two witnesses who signed the act. It's generally understood that it hurts defendants if the jury hears the amounts of money that are involved. And there's a lot of case law explaining why, apart from the choices Congress and the Supreme Court have made, just as a policy matter, it would be very bad for criminal defendants if all of this evidence were introduced at trial. It would certainly influence the outcome as to guilt. You sure you want to be arguing this? Well, I think it depends on the facts of the specific case. And I don't think it's an issue under the district court's sentencing practices because the defendant is given the option of waiving that jury finding, as Mr. Bellassagne did here. And so the government was left with proving loss at the sentencing hearing. But that, too, would have been a simple matter to bring two witnesses to testify as to the substance of business records that they had gathered and summarized for the court. Counsel, can I just clarify with you really quickly because you chose to focus on the sentencing enhancement for your portion of the appeal? As Judge Howard sort of went over with you, the district court decided to impose the sentencing enhancement based on his practices, which required him to conclude beyond a reasonable doubt, right? Correct. So, you know, again, when we're reviewing it, the district court actually made the finding under a higher standard than our case law requires, correct? Yes, that's correct. Thank you. If there are no further questions, we'll ask that the court remand for resentencing based on the aggravating role enhancement. Thank you. Good morning. May it please the court, Donald Lockhart for the government. Unless the panel has a different preference, I'll turn first to the government's cross appeal and then go back to the enhancement issue. It's clear from the existing record that the district court committed two procedural errors in calculating the guideline sentencing range and in determining loss. Number one, it applied the reasonable doubt standard to that determination instead of the preponderance standard, and number two, it refused to consider evidence that it itself deemed reliable simply because that evidence had not been presented at trial or had not come in at sentencing in the form of live witness testimony. So those two points are absolutely clear from the record. I don't even understand my sister to be seriously disputing them, except insofar as she is now talking about the kettle of fish remark, which actually helps us, because what the district court is saying in the kettle of fish remark is that in its restitution finding, it's a different kettle of fish. He says, because now I'm not going to use the reasonable doubt standard, and now I will consider all the government's reliable evidence, and in that context, I will find that the government has accurately estimated the loss to be above 550 thousand, which is the threshold here. So I had thought that my sister counsel had agreed at page 39 of her brief that in light of the kettle of fish remark, it's clear the district court would have come out in our favor on the issue of loss had it not committed these two procedural errors. Now I see the kettle of fish remark being leveraged in a different direction, which I frankly don't understand. Because from our perspective, that remark only makes crystal clear that the GSR error had a real impact here on this case. I thought that the harmless error argument that the defense was making in the brief was a different one, frankly, which is that the idea that the district court judge inevitably would have varied downward based on a systemic disagreement with the ponderance standard and the all-reliable evidence standard. And just to be clear, we have two responses to that harmless error argument, either one of which we feel would defeat it. And so you don't need to reach both. But in essence, our position on the defense harmless error argument made in the brief is that, number one, a district court judge lacks the power as a matter of law to vary downward systemically in every single case based on its categorical rejection of the two procedural rules that are in play here. And I can return to that point if you'd like. But the second argument is that even if you assume for the sake of argument that a district court judge has the power through the procedural framework within which sentencing occurs, we cannot be sure on this particular record, especially given that it's the defendant's burden of showing harmlessness, that not only would the district court judge have constructed such a variance in this case, but that the court would have, in addition, varied downward precisely to the same sentence that it imposed. The Supreme Court's made clear that even in the plain error context where the defendant has the burden of showing that a guideline error, that there's a reasonable probability that a guideline error affected the sentence, even in that context, the Supreme Court says defendants ordinarily will be able to satisfy that burden from the mere fact of the GSR calculation error, and that ordinarily, even in the GSR error, will require a remand. Here we have a situation where we preserve the error to the hilt, we're not tagged with the plain error standard, and not only that, we are the appellant, they're the appellee, they have the burden of showing harmlessness, and they can't carry it on this record for the sort of record-based reason that I've outlined. And if you accept that argument, you don't have to address the threshold question of whether a district court judge has the power, as a matter of law, to systemically reject the procedural rules in play here, in every single case, through the mechanism of a variance. Mr. Lockhart, this is a very serious case, and the government is, as I understand it, very concerned about this. Calling our attention to a practice which this district judge has, despite several requests from this court that he rethink his practices, has adhered to zealously since 2006. Surely, you do not want us to assume that, through variance, you can categorically implement the procedural rules. Do you want to impose the two rules that he has imposed? Certainly not, Your Honor. That's why we lead with the legal point that, from our perspective, a variance that is based on a categorical rejection of procedural rules is not permissible after Kimbrough. So I'd like to develop that argument a little bit more than I have. My point was simply to give you two markers right at the outset so that you can see sort of a bird's-eye view of our positions and understand that there is a world in which you could. Yes, but surely you don't want the second ruling and further litigation on this issue. I totally agree, and that's why I'll proceed. Okay, develop your first point. I'll develop the first point then. All right, so we know from Kimbrough that that case involved a substantive guideline provision. It was the drug guidelines, it was the crack powder ratio, and the question was whether a district court judge in the context of a variance can disagree with the commission's sort of substantive policy decision about the ratio of crack to powder cocaine. Kimbrough made crystal clear that sentencing court judges have enormous discretion to disagree with those sort of substantive guideline provisions and policy judgments of the commission, not just in the context of the drug guidelines, but in the context of the full gamut of substantive adjustments that exist in the sentencing guidelines. We're faced here with, to borrow the district court's locution, a different kettle of fish when it comes to procedural rules that cut across the guidelines and that serve as sort of the bedrock or foundation or framework within which sentencing occurs. Nothing in Kimbrough suggests that a district court judge has the power to downwardly vary systemically in every single case based on its categorical rejection of procedural rules such as that, and if the court did have such a power, notice that the sentencing guidelines in that event would cease to be the lodestar that the Supreme Court says that they should be, because you can have a situation in that sort of alternative universe where different district court judges could radically, through the mechanism of a variance, radically elevate the government's burden of proof while also radically shrinking the universe of facts that they'll consider, and that inevitably leads, number one, to unwarranted sentencing disparities as between defendants, but number two, it also means that defendants are not going to be sentenced based on all information regarding what the Supreme Court calls their real case, and that's why we have that issue in the book of remedial opinion. It's why the Supreme Court made the guidelines advisory so that we can have fact-finding under the preponderance standard based on a consideration of all reliable evidence, not just trial evidence, not just live witness testimony, and if a district court judge in the course of varying downward is doing so, essentially in violation of these two procedural rules, we say that that is an unlawful departure, shouldn't be permitted, and we would appreciate if the court could make that clear, because as Judge Lynch noted, the system has been going on for quite some time. It's generating externalities beyond the sentencing context. We see in the Abraham case that it's causing problems at the jury instruction phase. We see from the recent Ume case that it's causing problems at the plea colloquy phase, and I understand that those two things aren't in play in this case, because the defendant obviously went to trial and waived the right to a jury finding on loss, but it explains in part our decision to appeal in this particular case. Mr. Lockhart, do you see any difficulty from where you stand or sit for an appeal? We're an appellate court trying to determine whether a factual finding is clearly erroneous when we don't have a factual finding based on a preponderance standard. So I think you're turning now to the enhancement issue and the fact that works the other way, too. Yeah, so I guess with respect to the burden of proof, the fact that the district court applied the reasonable doubt standard to its role enhancement finding sort of cuts in our favor, I would think. Yeah, but if the district court had not found the enhancement, that's the problem I'm identifying. Oh, I see. Right. Well, yes, I take your point now. Right. So if the district court judge is consistently applying the reasonable doubt standard to its sentencing enhancements, we really can't be sure as a matter of appellate review sort of how it would have come out if the preponderance standard had been applied. And, yes, you're right. So when we decide these cases, we have to decide them hypothetically, in a sense. That's true. It's an additional externality I frankly hadn't even considered. Okay. That was my question. Thank you for the honest answer. Yes. So since we're talking about the enhancement, unless the court has a further question. Yes, I would. You've been talking about the difficulties, not only with the law, but with adding to the government's burden of proof. Could you talk for a little bit about what the district court's rules do, which is not to the defendant's advantage. Right. As we point out in the brief, the district court system creates certain distortions and externalities in the trial phase, in the sense that defendants who want a jury finding on a particular enhancement, the judge refuses to bifurcate, and therefore we have to put in evidence with respect to those enhancements at a stage in trial when the jury is trying to figure out whether the defendant's guilty of the charged offense and is trying to assess, you know, the elements of the charged offense. We have cases, and there's a footnote in our brief illustrating how post-Abraham, where the district court has submitted all manner of enhancements to juries, some of them, you know, very different from or in far fields from what the district court has submitted. It's very different from the question of guilt, innocence, and elements of the offense. And so you have a situation where juries are simultaneously considering evidence that probably ordinarily wouldn't even come in with respect to the elements of the charged offense. That's one problem. You also have the problem that under the district court's system, and we saw it right in this case, if a defendant at sentencing offers evidence that wasn't admitted at trial, the judge will refuse to consider that. The defendant's trial counsel here offered a couple of categories of evidence in opposing the role enhancement, and the judge said the door swings both ways. My system applies to you, and I'm not going to consider this evidence, even if it's reliable, because it just didn't happen to be admitted at trial in the form of a trial exhibit. As we concede in the brief, that was error, too. It's not an error my sister chose to raise in her brief, so it's, from our perspective, waived. But it does illustrate, to your Honor's point, the fact that this system has disadvantages for defendants and not just the government. Has this judge declined to bifurcate, refused a request by the government to bifurcate? Yes. There's a footnote in the brief where we catalog some of the post-Abraham cases in which the judge has submitted enhancements to the jury, and I believe if you look at the record of those cases, that there's at least one where the judge refused to bifurcate. Do you remember how long ago that one, that case was? You know, rather than answer right on the spot, if I could submit a letter to the court on that issue, because I don't want to just try to shoot from memory, I believe it's one of the cases that we cite in the footnote, but I'd appreciate a chance to send the court a letter on that point. Unless the court has further questions, we'll rest on the brief. Thank you. At this time, would counsel for the appellant cross-appellee please reintroduce herself on the record. She has a three-minute rebuttal. Good morning. Megan Sittle on behalf of Mr. Bellasson. I disagree with the government that the district court here refused to consider evidence that it considered reliable. It's true that in calculating what the district court sees as the statutory maximum, it does exclude evidence there. But in running the 3553A analysis, the district court does state that it has read all of the sentencing submissions, including the 700-page binder the government submitted with all of the evidence it had hoped to introduce. But apparently you tried to put in evidence helpful to the defendant at some point. And you did include evidence in the sentencing, which might or might not have led to a lesser sentence, and the district court excluded that. Yes, that's correct. And the district court, those documents had been marked for identification. They were before the district court, but it did not consider it in calculating what it sees as the statutory maximum. And from your point of view, they met every indicia of reliability. Yes, those documents were e-mails that were from the witness Harriet Wingrove. We didn't have any reason to question that those e-mails were authentic. But the district court also, you can see in the transcript, considers the PSR, which is, of course, full of hearsay. It considers the letters submitted by victims, as well as in support of Mr. Bellison. It considers counsel's arguments, and it considers Mr. Bellison's statements. So it does take that information into account. It just doesn't use it in calculating the statutory maximum. And I also disagree with the government. Let me stop you on that. I've always understood that you calculate the GSR guideline sentencing range, so both the government and the defendant have an idea of the scope of possible penalty. Then there is the consideration of the 3553A factors. Sometimes that helps the defendant, sometimes it doesn't. But it starts with the calculation of the GSR. And partly it helps both sides as to the arguments under 3553A to know what that is. You seem to be saying it's okay to skip the first step. As long as you get to the second step, the 3553A. Is that your argument? That is not my argument. That first step does need to take place. My argument is that that step is discernible in the record here. Not as clear, I agree, as it ideally would have been. And it's also clear in the district court's description of its practices that it does include that step. Thank you.